UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

v.                                          **DECISION and ORDER**
                                                                         00-CV-478S

TEE TO GREEN GOLF PARKS, INC.,
SUSAN BLUMHAGEN, and STEVEN BLUMHAGEN,

                Defendants.

## I. INTRODUCTION

Presently before this Court are pro se Defendant Steven Blumhagen's ("Blumhagen") Motion to Dismiss and Plaintiff Securities and Exchange Commission's ("the Commission") Motion for Partial Summary Judgment.[1] For the following reasons, Blumhagen's motion is denied and the Commission's motion is granted.

## II. BACKGROUND

On May 31, 2000, the Commission filed its complaint in this action alleging that Tee to Green Golf Parks Inc., Blumhagen, Susan Blumhagen (Blumhagen's wife), and four other defendants conducted a fraudulent scheme to sell promissory notes through numerous misrepresentations and falsehoods and then misappropriated the proceeds from the sale of those notes. (Complaint, Docket No. 1.) The Commission's claims against the

---

[1]The two motions are somewhat intertwined. The Commission filed its Motion for Partial Summary Judgment with supporting papers on January 29, 2010. (Docket Nos. 151-155.) That same day, Blumhagen filed his Motion to Dismiss. (Docket No. 156.) The Commission filed a memorandum in opposition to Blumhagen's motion on February 23, 2010 (Docket No. 157), and Blumhagen filed a declaration in support of his own motion and in opposition to the Commission's motion on March 11, 2010 (Docket No. 160). The Commission filed a reply in support of its motion on April 9, 2010, which concluded briefing. (Docket No. 161.) Neither Tee to Green nor Susan Blumhagen responded to the Commission's motion, although Blumhagen purports to make arguments on their behalf.

four other defendants — David E. Trotter, Hanover Financial Group, Inc., Donald W. Owens, and Financial Security Group Insurance Agency, Inc. — have been resolved. Tee to Green, Blumhagen, and Susan Blumhagen are the only remaining defendants.

The Commission alleges that Tee to Green and Blumhagen violated federal securities laws, specifically 15 U.S.C. §§ 77e(a) and 77e(c), 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5. (Id. at ¶¶ 61-73.) It further alleges, that Susan Blumhagen violated 15 U.S.C. §§ 77q(a) and 78j(b), and 17 C.F.R. § 240.10b-5, or alternatively, aided and abetted the violation of federal securities laws in violation of 15 U.S.C. § 78t(e). (Id. at ¶¶ 61-69.)

Blumhagen was president of Tee to Green. (Commission's Statement,[2] Docket No. 153, ¶¶ 4(a), 14.) He was actively involved in the offer and sale of the notes and hired David Trotter to oversee the offering. (Id. at ¶¶ 7.) Susan Blumhagen also worked at Tee to Green. She performed ministerial duties with respect to the notes, including writing and remitting checks, and maintained records relating to the notes. (Id. at 15.) She also participated in the misuse of investor funds by authorizing corporate resolutions to distribute in excess of $1.5 million to Blumhagen. (Id. at 17.)

**A.   The Scheme**

In 1997, Tee to Green, which had a golf practice facility in Buffalo, N.Y., offered and sold nearly $12 million in promissory notes to at least 320 investors in various states, including Ohio, Oregon, North Carolina, South Carolina, Mississippi, and Pennsylvania. (Id. at ¶ 6.) The notes, which were not registered, offered purchasers a ten percent return

---

[2]Referring to the Commission's Rule 56 Statement of Undisputed Facts, which contains citations to the record evidence. This Court has confirmed and is satisfied that the evidence cited supports the assertions therein. Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) (holding that factual allegations contained in a Rule 56.1 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

on their investment, with repayment promised in nine months. (Id. at ¶¶ 7, 9.) When a sales agent sold a note, he or she notified Tee to Green, which then issued the notes, signed by Blumhagen, directly to the investors. (Id. at ¶ 8.) Sales agents earned a commission on the sale of each note. Of the $12 million raised, Tee to Green paid sales agents approximately $1.8 million in commissions. (Id. at ¶ 8.)

The defendants used multiple misrepresentations and material omissions to induce investors to purchase the notes. Most glaringly, the offering materials — an offering summary, brochure, and application — falsely represented that the notes were bonded, insured, and reinsured. (Id. at ¶¶ 7, 11.) In addition, the materials failed to disclose that a significant portion of the proceeds from the offering would be used to compensate the sales agents. (Id. at ¶ 12.)

Moreover, the offering materials stated that the proceeds raised would be used by Tee to Green for the "Tee to Green Golf Parks" project. (Id. at 13.) This, however, was not entirely the case. The Blumhagens used proceeds from the offering for personal and unrelated business expenses, including (1) investing $900,000 in a Florida insurance company, (2) investing $750,000 in an offshore bank in Barbados, (3) paying more than $1.5 million to Blumhagen as "compensation," (4) using $100,000 to cover margin calls in the Blumhagens' personal securities account, and (5) using $200,000 to finance the Blumhagens' friend's real estate deal. (Id. at 13.) None of these expenditures were disclosed to the investors. (Id. at 13.)

In the end, Tee to Green never repaid the notes, nor were the notes insured, thus resulting in more than $10 million in loss to the investors. (Id. at 18.)

**B.     The Criminal Proceedings**

On February 28, 2003, a federal grand jury indicted the Blumhagens for the conduct discussed above. (See United States v. Steven Blumhagen, et al., 03-CR-56S.) After initial discovery and pretrial motions, Blumhagen pled guilty on April 18, 2006, to one count of mail fraud and one count of conspiracy. The government then dismissed the criminal charges against Susan Blumhagen at that time. On December 15, 2006, this Court effectively sentenced Blumhagen to serve 57 months of incarceration and to pay restitution jointly and severally with Trotter in the amount of $10,731,240.97.

In his plea agreement, and again during the entry of the plea, Blumhagen admitted to engaging in the following conduct, which formed the factual basis for his plea:

> [1]  From in or about 1993 through 2000, the defendant, STEVEN D. BLUMHAGEN, was the president of Tee to Green Golf Parks, Inc. (Tee to Green), located in the Western District of New York. As president, defendant BLUMHAGEN controlled the day-to-day operations of Tee to Green and was intimately involved in the sale of Tee to Green promissory notes. The promissory notes reflected loans to Tee to Green. The defendant caused these notes to be marketed upon representations that they were bonded, insured and re-insured, but he never obtained bonding and insurance for the notes. Noteholders relied upon the representation that the Tee to Green notes were bonded and insured in order to protect them from loss on their loans to Tee to Green.
>
> [2] From in or about January, 1997 to January, 1998 in the Western District of New York and elsewhere, defendant BLUMHAGEN, with David Trotter and others who knew that the Tee to Green notes were not bonded, insured or re-insured, agreed to and did cause Tee to Green notes to be marketed to numerous people upon the representation that the Tee to Green notes were bonded, insured and re-insured. As noted above, this representation was not true, and the defendant, Trotter, and others knew that it was not true.
>
> [3] Responding to the offers by defendants BLUMHAGEN,

Trotter, and others to purchase the Tee to Green notes, noteholders mailed applications for the notes, and checks representing payment for the notes. These mailings went to Tee to Green in the Western District of New York. One such mailing was from Ralph Hughes who mailed a check to Tee to Green in the amount of $128,062.49.

[4] The deposits of these checks into the Tee to Green bank account were overt acts in furtherance of the agreement to sell the Tee to Green notes as if they were bonded, insured, and re-insured when they were not. One such overt act occurred February 5, 1997, which was the deposit of the aforementioned Ralph Hughes check.

[5] After receiving the applications and checks for the Tee to Green notes, the defendant and others caused the Tee to Green notes to be mailed from the Western District of New York to numerous noteholders via the United States Mail. Specifically, on or about December 5, 1997, the defendant used, or caused to be used, the United States mail to send a Tee to Green promissory note, in the amount of $60,000, to Stephen P. Jennings.

[6] As a result of the sale of the Tee to Green promissory notes, approximately $11.5 million were mailed to and received by Tee to Green from the noteholders who purchased the notes. The defendant did cause the Tee to Green facility to be built in Buffalo, New York, and the facility became operational from in or about May, 1998 until it failed in or about September, 2000. Most Tee to Green noteholders were not repaid, and since the promissory notes were not bonded, insured and re-insured, their money was lost.

[7] The defendant admits that he knew that the Tee to Green notes he was marketing were not bonded or insured. He also acknowledges that, of the approximately $11.5 million of the money he received from noteholders, he used approximately $2.5 million for personal expenses not related to the Tee to Green or golf facilities.

(See Plea Agreement, Riely Declaration, Docket No. 154, Exhibit 3.)

## III. DISCUSSION

### A. Blumhagen's Motion to Dismiss

Because Blumhagen is proceeding pro se, he is entitled to broad consideration of his submissions. Federal courts routinely read pro se submissions liberally, and interpret them to raise the strongest arguments that they suggest. See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). This Court has considered Blumhagen's submissions accordingly.

Blumhagen seeks dismissal of this case on statute of limitations grounds. Although he correctly notes that the statute of limitations is five years, see 28 U.S.C. § 2462,[3] his application of the statute of limitations is incorrect. Blumhagen argues that dismissal is required because this case has been *pending* for longer than five years. The statute of limitations, however, requires that a case be *commenced* within five years of the accrual of the claim. Here, the claims accrued in 1997 and the Commission commenced this case in 2000, well within the five-year statute of limitations period. Blumhagen also erroneously relies on the five-year statute of limitations set forth in 18 U.S.C. § 3282, which applies in certain criminal, not civil, cases. For these reasons, Blumhagen's Motion to Dismiss will be denied.

---

[3]"Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon." 28 U.S.C. § 2462.

**B.    The Commission's Motion for Partial Summary Judgment**

    **1.    Summary Judgment Standard**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence

showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

By rule, judgment may also be entered against a party that fails to respond to a properly filed motion for summary judgment, if appropriate. FED. R. CIV. P. 56 (e)(2). This district's Local Rules provide for similar relief: a nonmoving party's failure to file and serve an answering memorandum or affidavit may constitute grounds for resolving the motion against it. See Local Rule 7 (a)(2)(A) and (a)(3).

But failure to oppose or respond to a motion for summary judgment standing alone does not warrant granting the motion: "the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." See Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244, 246 (2d Cir. 2004) ("failure to respond to [a Rule 56] motion does not alone discharge the burdens imposed on a moving party"); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001). If the moving party fails to submit evidence sufficient to meet its burden, "summary judgment must be denied even if no opposing evidentiary matter is presented." Amaker, 274 F.3d at 681. Consequently, the Second Circuit has emphasized that district courts "'in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" Vt. Teddy Bear, 373 F.3d at 246 (quoting Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993)).

**2. Securities Laws**

Sections 5(a) and 5(c) of the Securities Act of 1933 make it unlawful to offer or sell non-exempt securities that are not registered with the Commission. See 15 U.S.C. §§ 77e(a) and (c). In particular, in the absence of a registration statement, it is unlawful to "make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell [a] security through the use or medium of any prospectus or otherwise" and unlawful to "carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." Id.

Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 of the Securities Exchange Act of 1934 make it unlawful to defraud purchasers of securities by, *inter alia*, making misleading or false statements of material fact, or omitting material facts. See 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5.

In particular, it is unlawful "to employ any device, scheme, or artifice to defraud" in the offer or sale of securities; "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a); see also 17 C.F.R. § 240.10b-5.

It is also unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . .

. any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

A threshold issue underlying the Commission's claims is whether the Tee to Green notes sold to purchasers qualify as securities. Section 2(1) of the Securities Act of 1933 and Section 3(a)(10) of the Securities Exchange Act of 1934 define the term "security" to include "any note." See 15 U.S.C. § 77b(a)(1), 78c(a)(10). Such a broad definition is purposeful: Congress intended "to encompass virtually any instrument that might be sold as an investment." Reves v. Ernst & Young, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). The United States Supreme Court has described Congress' goal as follows:

> In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and determined that the best way to achieve its goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"

Reves, 494 U.S. at 60-61 (internal citations omitted)

Nonetheless, Congress did not "intend to provide a broad federal remedy for all fraud." Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). When determining whether a financial transaction meets the definition of security, "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). This is because "Congress' purpose in enacting the securities laws was to regulate

*investments*, in whatever form they are made and by whatever name they are called." Reves, 494 U.S. at 61 (emphasis in original).

The Supreme Court has determined, however, that the term "any note" in the statutory definition does not literally mean any note, but rather, "must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." Id. at 63. To determine whether a note qualifies as a security, the "family resemblance" test applies. See id. at 64-65. Essentially, if the note in question bears a "family resemblance" to notes that have been judicially recognized as *not* qualifying as securities, then the note is not a security. See id.; see also Chem. Bank v. Arthur Andersen & Co., 726 F.2d 930, 939 (2d Cir. 1984); Exch. Nat'l Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1137 (2d Cir. 1976). Those notes not qualifying as securities include the following: "the note delivered in consumer financing; the note secured by a mortgage on a home;[4] the short-term note secured by a lien on a small business or some of its assets; the note evidencing a character loan to a bank customer; short-term notes secured by an assignment of accounts receivable; a note which simply formalizes an open-account debt incurred in the ordinary course of business; and notes evidencing loans by commercial banks for current operations." Intelligent Digital Sys., LLC v. Visual Mgmt. Sys. Inc., 683 F. Supp. 2d 278, 283-84 (E.D.N.Y. 2010) (citing Reves, 494 U.S. at 65).

The test begins with the presumption that every note is a security, based on the statutory "any note" language. See Reves, 494 U.S. at 65. This is a rebuttable

---

[4] Blumhagen contends that a portion of the notes were secured by mortgages and therefore cannot be classified as securities. He has not, however, presented any supporting evidence, nor does this change the fact that at least a portion of the notes were not secured by mortgages.

presumption that can be overcome by demonstrating that the note in question resembles the non-qualifying notes, or deserves being added to the list of non-qualifying notes.

Four factors require examination. First, the court must examine the transaction to assess the motivations of the buyer and seller. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security'." Id. at 66. Second, courts must consider the distribution plan "to determine whether it is an instrument in which there is 'common trading for speculation or investment." Id. (quoting SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943)). If the note is "offered and sold to a broad segment of the public," it is likely to be deemed a security. Roer v. Oxbridge, Inc., 198 F. Supp. 2d 212, 224 (E.D.N.Y. 2001). Third, courts must assess the reasonable expectations of the investing public. Reves, 494 U.S. at 66. In other words, whether a reasonable investor would view the note as a security. See id. Finally, courts examine "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." See id. at 67 (citing Marine Bank, 455 U.S. at 557-59, and n. 7).

Here, there is little question that the Tee to Green notes qualify as securities. Blumhagen and Tee to Green sought money for general business use and the purchasers undoubtedly viewed their purchase of the notes as investments, enticed by the prospect of a ten percent return. The purchasers' investment motivation strongly suggests that the notes are securities. See Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 812 (2d Cir. 1994). In addition, the defendants admit that the Tee to Green notes were widely offered,

12

and indeed, sold to hundreds of people in at least six different states, which is further indicia that the notes qualify as securities. See Roer, 198 F. Supp. 2d at 224. Moreover, the fact that these notes were marketed as bonded, insured, and reinsured, would lead any reasonable investor to expect that they were purchasing investments in protected securities. And finally, no other regulatory scheme protects the investors in this case. The purchasers of Tee to Green notes constitute exactly the segment of the investing public that Congress sought to protect. For these reasons, this Court finds that the Tee to Green notes are securities.

Blumhagen argues that the Tee to Green notes are not securities because they matured within nine months of purchase. This argument is not persuasive. Although under Section 3(a)(3) of the Securities Act of 1933 and Section 3(a)(10) of the Securities Exchange Act of 1934 short-term notes with maturity not exceeding nine months are excluded from the definition of "security," see 15 U.S.C. §§ 77c(a)(3), 78c(a)(10), the Second Circuit held in Zeller v. Bogue Elec. Mfg. Corp. that "the mere fact that a note has a maturity of less than nine months does not take the case out of Rule 10b-5, unless the note fits the general notion of 'commercial paper'." 476 F.2d 795, 800 (2d Cir. 1973); see also S.E.C. v. R.G. Reynolds Enters., Inc., 952 F.2d 1125, 1132 (9th Cir. 1991) ("We agree with these circuits that logic and legislative history favor limiting the short-term note exception to commercial paper and hold that the presumption that a note is a security applies equally to notes of less than nine months maturity that are not commercial paper."). The Tee to Green notes are not commercial paper, which is defined in this context as "short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors." Reves, 494 U.S. at 70. Consequently, despite their

maturity dates, this Court finds that the Tee to Green notes are securities.

> 3. **Defendants' Liability**
>> a. **Steven Blumhagen and Tee to Green**

As it relates to the alleged violations of § 5 of the Securities Act of 1933, Blumhagen and Tee to Green admit in their answer that the notes they sold to investors through the mail in six separate states were not registered with the Commission. (Answer, Docket No. 18, ¶¶ 34, 37.) Moreover, as determined above, the Tee to Green notes qualify as securities. Thus, the undisputed evidence demonstrates that Blumhagen and Tee to Green offered and sold unregistered securities through the use of interstate facilities or the mail, in violation of § 5 of the Securities Act of 1933. See 15 U.S.C. § 77e(a) and (c). The Commission's request for summary judgment as to liability on this claim will therefore be granted.

As it relates to the alleged violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, Blumhagen has already admitted through his criminal plea that he defrauded the Tee to Green note purchasers. The doctrine of collateral estoppel bars Blumhagen from relitigating his participation in the scheme. See United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978) (applying collateral estoppel bar); SEC v. Freeman, 290 F. Supp. 2d 401, 405 (S.D.N.Y. 2003) (similar).

Blumhagen admitted that he "caused these notes to be marketed upon representations that they were bonded, insured, and re-insured, but he never obtained bonding and insurance for the notes," and admitted that "he used approximately $2.5

million for personal expenses not related to Tee to Green or golf facilities." (Plea Agreement, Riely Declaration, Exhibit 3.) In addition, Blumhagen's misstatements and omissions of fact were material, a fact he admitted in his plea. (See Plea Agreement, Riely Declaration, Exhibit 3 (admitting that "Noteholders relied upon the representation that the Tee to Green notes were bonded and insured in order to protect them from loss").) Investors were lied to and not told that their investments would be at least partially used to pay sales commissions and fund the Blumhagens' personal investments and expenses. The undisputed facts show that Blumhagen made these statements knowingly and voluntarily, with intent to deceive and defraud the purchasers. His misconduct is imputed to Tee to Green because Blumhagen was president and ran the entity's day-to-day operations. See SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing individual's awareness of securities laws violations to corporation over which he had "blanket control").

Thus, the undisputed evidence demonstrates that Blumhagen and Tee to Green defrauded the Tee to Green note purchasers, in violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. See 15 U.S.C. § 77q(a), 78j(b); 17 C.F.R. § 240.10b-5. The Commission's request for summary judgment as to liability on these claims will therefore be granted.

      **b.**     **Susan Blumhagen**

The undisputed evidence demonstrates that Susan Blumhagen also defrauded Tee to Green note purchasers by making material misstatements or omissions of fact and authorizing corporate resolutions to funnel investor money to Blumhagen for their family's non-authorized personal use. (Commission's Statement, ¶¶ 15, 17.) Susan Blumhagen

has not responded to the Commission's motion and has not offered any evidence to rebut the Commission's evidence that she knowingly engaged in this conduct for the purpose of defrauding investors and personal gain. Accordingly, the Commission's request for summary judgment as to Susan Blumhagen will also be granted.

**C.     Injunctive Relief**

The Commission requests entry of a permanent injunction barring the defendants from engaging in future violations of federal securities laws. Section 20(b) of the Securities Act of 1933 and Section 21(d)(1) of the Securities Exchange Act of 1934 permit the Commission to obtain permanent injunctive relief upon a showing that (1) the defendants violated the securities laws, and (2) there is a reasonable likelihood that they will again do so in the future. See SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978); S.E.C. v. Anticevic, No. 05 CV 6991 (KMW), 2010 WL 2077196, at *6 (S.D.N.Y. May 14, 2010); 15 U.S.C. §§ 77t(b) and 78(u)(d)(1).

The Second Circuit requires examination of the following factors to determine whether such injunctive relief is warranted: (1) the fact that the defendants have engaged in illegal conduct; (2) the degree of scienter involved; (3) the isolated or repeated nature of the violations; (4) the defendants' recognition of the wrongful nature of their conduct, and (5) whether the defendant may be in a position to recidivate. See SEC v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1998); S.E.C. v. Shehyn, No. 04 CV 2003 LAP, 2010 WL 3290977, at *6 (S.D.N.Y. Aug. 9, 2010).

As discussed above, this Court finds that the undisputed material facts establish that the defendants violated federal securities laws. The defendants did so knowingly and voluntarily, and with the intent to profit off of the sale of notes that they repeatedly and

16

intentionally misrepresented were bonded, insured, and reinsured, when, in fact, they knew that they were not. The defendants sold hundreds of notes in several states — nearly $12 million worth in all. The conduct was egregious and the scheme extensive. And it is clear from the submissions that the defendants refuse to acknowledge their wrongdoing and it is likely that they will be in a position to repeat similar schemes in the future if not enjoined. Accordingly, this Court will grant a permanent injunction, enjoining the defendants from future violations of the federal securities laws. The Commission will be directed to prepare a proposed injunction order for this Court's review and signature.

**D.     Civil Damages**

In its complaint, the Commission seeks civil penalties and disgorgement against the defendants. It has not, however, moved for summary judgment on this issue. Rather, it has requested that this Court declare that any civil penalties awarded be "third tier" civil penalties to deter securities law violations. See 15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii) (providing for enhanced civil damages of $100,000 per violation). Because the Commission has not moved for summary judgment as to the civil penalties aspect of this case, it is premature for this Court to determine whether "third tier" penalties are appropriate.

## IV. CONCLUSION

For the reasons stated above, Blumhagen's Motion to Dismiss will be denied, the Commission's Motion for Partial Summary Judgment will be granted, and the defendants will be permanently enjoined from further violating the federal securities laws.

## V. ORDERS

IT HEREBY IS ORDERED, that Steven Blumhagen's Motion to Dismiss (Docket No. 157) is DENIED.

FURTHER, that the Commission's Motion for Partial Summary Judgment (Docket No. 151) is GRANTED.

FURTHER, that within 14 days of the date of this Decision and Order, the Commission will email[5] to this Court a proposed permanent injunction order for review and signature.

FURTHER, that the parties shall appear before this Court on February 25, 2011, at 9:00 a.m. for a status conference to determine how this case will proceed.

SO ORDERED.

Dated:      January 18, 2011
               Buffalo, New York

                                            /s/William M. Skretny
                                            WILLIAM M. SKRETNY
                                            Chief Judge
                                            United States District Court

---

[5] To be sent in WordPerfect format to skretny@nywd.uscourts.gov.